**MOBIL OIL CORPORATION, Petitioner,**

v.

**Robert S. CALVERT et al., Respondents.**

No. B–1730.

Supreme Court of Texas.

March 11, 1970.

Rehearing Denied April 15, 1970.

J. C. B. Aler and W. H. Tabb, Dallas, for petitioner.

Crawford C. Martin, Atty. Gen., J. H. Broadhurst, Asst. Atty. Gen., Austin, for respondents.

CALVERT, Chief Justice.

Mobil Oil Corporation sued the State Comptroller, the Attorney General and the State Treasurer, hereafter called State, to recover the sum of $386,893.65 paid to State by Mobil, under protest, as occupation taxes for producing gas. The total sum sued for includes taxes on three separate phases of Mobil's operations, and interest and penalties thereon, in separate sums as follows: $301,415.55, $73,251.70 and $12,226.40.

The trial court awarded Mobil a recovery of a portion—$4,307.74—of the third item, but decreed that Mobil otherwise take nothing. Mobil appealed and by proper points of error complained in the court of civil appeals of the action of the trial court in denying to it a recovery of items 1 and 2 and the balance of item 3. The court of

civil appeals affirmed the judgment of the trial court in so far as it denied a recovery of item 1 and the balance of item 3, but reversed the judgment in so far as it denied a recovery of item 2 and rendered judgment for Mobil for that item. 443 S.W.2d 583.

In this court Mobil attacks the judgment of the court of civil appeals in so far as it denies a recovery of item 1, and State attacks the judgment in so far as it awards a recovery of item 2. Neither party questions the disposition made of item 3 by judgments of the courts below, and any issues as to that item have gone out of the case. We hold that Mobil is entitled to judgment for both items 1 and 2.

At the time of the events in question, Article 3.01, Title 122A, Vernon's Ann.Civ. Stat., levied and required the payment by each producer of an occupation tax on the business of producing gas, computed "on the amount of gas produced and saved * * * equivalent to seven per cent (7%) of the market value thereof as and when produced"; and Article 3.02(1) defines "market value of gas" as "the value thereof at the mouth of the well." The disagreement between the parties concerning the liability of Mobil for the taxes included in item 1 grows out of a difference of opinion as to whether the tax is levied by the statute on the market value of the total production of gas from a particular lease or well, as Mobil contends, or on the market value of the several separate ownership interests in the production, as State contends. Their item 2 disagreement turns on whether the market value of residue gas, returned by processors to Mobil for use on its leases, is to be measured by the price for which Mobil sold it, as Mobil contends, or by the price for which the processors could sell it, as State contends.

The facts are stipulated. Mobil owns and operates a number of producing oil and gas leases in the Seeligson Field in Jim Wells County and the Pegasus Field in Midland and Upton Counties. The leases require Mobil to pay, as gas royalty, ⅛th of the market value of the gas at the mouth of the well for all gas sold or used off the premises. However, none of the gas is sold for cash at the wellhead. Instead, Mobil pipes the gas to processing plants where liquid hydrocarbons are separated. The processors then sell the liquid hydrocarbons and a part of the residue gas to pipeline companies. Under its contract with the processors, Mobil receives a percentage of these cash sales and the processors retain the balance. Mobil then pays the total tax due the State and remits to the royalty owners their ⅛th royalty in cash, less the amount of the occupation tax paid on their behalf.

At one time, Mobil and the State were in agreement about the method for determining the wellhead market value of the processed gas and products. If the first cash sales of the gas and products were made by the processing plants, the wellhead market value of the raw gas was determined by totaling the gross receipts from sales by the processing plants and subtracting all transportation and processing expenses. The total tax was ascertained by taking 7% of the remainder, and the tax was then ratably shared, ⅛th by the royalty owners and ⅞ths by the operator, Mobil.

The problem arose after Mobil unitized the Seeligson Field in 1956 and the Pegasus Field in 1961. At first, the royalty owners resisted the proposed unitization. They consented to it only upon Mobil's agreement to pay them in cash ⅛th of the gross receipts from the sales of gas and products by the processing plants. This meant that the royalty owners would no longer pay their proportionate ⅛th of the processing costs. It also meant that Mobil would thereafter pay the processing costs allocable to the royalty owners' ⅛th as well as its own share of costs on its ⅞ths of the products. It is in this factual context that State contends that it became entitled to more tax on total production than it was entitled to before Mobil assumed payment of the royalty owners' share of processing costs.

The State's case for collecting a greater amount of money than would have been yielded by a tax of 7% on the proceeds of the sale of all the hydrocarbons after deduction of all costs of processing, rests upon its interpretation of the opinions of the Austin Court of Civil Appeals in Group No. 1 Oil Corp v. Sheppard, 89 S.W.2d 1021 (1935, writ ref'd), and Sheppard v. Stanolind Oil & Gas Co., 125 S.W.2d 643 (1939, writ ref'd). The State says that these two decisions interpret the relevant taxing statutes to require that the interests of Mobil and the royalty owners in the gas be treated as separate interests and be taxed separately; and that when thus treated, the royalty owners must be taxed on $\frac{1}{8}$th of the proceeds of the sale of the hydrocarbons without deduction of costs (because they are not paying any of the costs), and Mobil must be taxed on the other $\frac{7}{8}$ths of the proceeds after deduction of only $\frac{7}{8}$ths of the costs. We do not agree with State's interpretation of the cited cases, and neither do we agree with its interpretation of the taxing statutes.

The relevant portions of the taxing statutes are:

Art. 3.01: "(1) There is hereby levied an occupation tax on the business or occupation of producing gas within this State, computed as follows: A tax shall be paid by each producer on the amount of gas produced and saved within this State equivalent to seven and one-half per cent $7\frac{1}{2}\%$)[1] of the market value thereof as and when produced. * * *"

Art. 3.02: "(1) The market value of gas produced in this State shall be the value thereof at the mouth of the well; however, in case gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts. * * *"

Art. 3.03: "(1) The tax hereby levied shall be a liability of the producer of gas and it shall be the duty of each such producer to keep accurate records in Texas of all gas produced, * * *."

"(2) The purchaser of gas shall pay the tax on all gas purchased and deduct the tax so paid from the payment due the producer or other interest holders, * *."

"(5) The tax herein levied shall be borne ratably by all interested parties, including royalty interests; and producers and/or purchasers of gas are hereby authorized and required to withhold from any payment due interested parties, the proportionate tax due and remit the same to the Comptroller."

Art. 3.04: "(1) For the purpose of this Act 'producer' shall mean any person owning, controlling, managing, or leasing any gas well and/or any person who produces in any manner any gas by taking it from the earth or waters in this State, and shall include any person owning any royalty or other interest in any gas or its value whether produced by him, or by some other person on his behalf, either by lease, contract, or otherwise."

"(11) 'Production' or 'total gas produced' shall mean the total gross amount of gas produced including all royalty or other interest; that is, the amount for the purpose of the tax imposed by this Article shall be measured or determined by meter readings showing one hundred per cent (100%) of the full volume expressed in cubic feet."

"(13) 'Royalty owners' shall mean and include all persons owning any mineral rights under any producing leasehold within this State, other than the working interest, which working interest is that of the person having the management and operation of the well."

The foregoing statutes were not the subject of interpretation in *Group No. 1 Oil Corp.*, supra, and *Stanolind Oil & Gas Co.*, supra. However, the oil-taxing statutes which were interpreted in the decisions

---

1. The present tax is $7\frac{1}{2}\%$ but at all times relevant here the tax was 7%.

were not significantly different from the quoted gas-taxing statutes. In any event, the two decisions should be weighed in relation to the issues actually decided. In *Group No. 1 Oil Corp.*, the State was claiming that the lessee was required to pay taxes computed on the entire production even though a ⅛th royalty was owned by the University of Texas and as state property was not taxable. In *Stanolind Oil & Gas Co.*, the State was claiming that the lessee was required to pay taxes computed on the entire production, including a ⅛th of ⅝ths of the first oil produced which was committed by the lease to the payment of large cash bonuses to the State. In both cases the court held that the lessee-producer was not liable for the tax on these non-taxable interests. In both cases the court was concerned with a lessee-producer's liability for the tax on the oil produced, and not, as here, with the proper method of computing the tax.

■ We find no sound basis in the quoted statutes for holding that the tax imposed thereby must be computed on each ownership interest separately. We hold that the market value of gas at the mouth of the well in cases such as this is measured, as to all ownership interests, by the total proceeds of the sale of the component parts of the gas after processing, less transportation and processing costs; and that each taxable ownership interest is liable to the State for its proportionate part of the tax computed on market value as thus ascertained. Our holding is predicated upon our conclusion that the descriptive noun, "producer", as used in the statutes, defines two classes of persons, to wit: (1) all owners of interests in the gas as defined in Art. 3.04(1), including royalty owners, and (2) only those owners of working interests who actually produce the gas; and by our further conclusion that the provisions of Art. 3.01(1) directing that the tax be computed by each producer on the amount of gas produced and saved, refers to the second class of producers. Considered in connection with the provisions of

Art. 3.04(11), Art. 3.01(1) would seem to bear no other reasonable interpretation. When the statute is interpreted as indicated, the tax to be paid was not affected by Mobil's agreement to assume payment of the processing costs theretofore paid by the royalty owners.

■ We deal next with the question presented by State's application for writ of error. Mobil has a contract with the processing plants concerning the residue gas, that which remains after the liquid hydrocarbons have been separated. For all residue gas which the processing plants sell, the processing plants receive a percentage and Mobil, as the producer, receives a percentage. Mobil has the right, under its contract, to require the processing plants to return to it a part of the residue gas for use in the operation of the equipment and machinery on Mobil's leases. Nothing indicates that Mobil has the right to demand a return of residue gas so it can sell the gas to a pipeline company.

The trial court held and the State contends that the market value of the lease-use gas is the amount for which the processing plant would have sold the lease-use gas if it had not been returned to Mobil. The court of civil appeals correctly reversed this part of the trial court judgment. It held that the market value of the lease-use gas was the price that Mobil, the producer, would have received from the sale of such gas to the processing plant, not the price which the processing plant would have received for the processed gas. Art. 3.02, Title 122A, provides:

"* * * [I]n case gas is sold for cash only, the tax shall be computed on the *producer's* gross cash receipts. In all cases where the whole or a part of the consideration for the sale of gas is a portion of the products extracted from the producer's gas or a portion of the residue gas, or both, the tax shall be computed on the gross value of all things of value received by the *producer*, including any bonus or premium; * * *."

Mobil is the producer. The statute states that the tax is computed on the "gross value * * * received by the producer * * *." The market value of the lease-use gas is the price Mobil would have received from the sale of the raw gas to the processing plants and not the subsequent sale by the processing plants to a pipeline company. This is the holding in W. R. Davis, Inc. v. State, 142 Tex. 637, 180 S.W.2d 429 (1944), cited and discussed by the court of civil appeals.

We have held that Mobil is entitled to recover the sums shown in the beginning of this opinion as items 1 and 2. There is an indication in the record that these sums have been drawing interest while they were in suspense, and that the full amount which Mobil is entitled to recover needs to be ascertained. For that reason, the judgments of the courts below as to item 3 are left undisturbed; but the claims represented by items 1 and 2 are severed into a separate cause, and the judgments of the courts below in such cause are reversed and the cause is remanded to the trial court for the entry of judgment consistent with this opinion. All costs are assessed against the State.